# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

| | |
|---|---|
| WALTER ANDREW WARE, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>TONY MAYS,[1] )<br>)<br>Respondent. ) | Case No. 1:14-cv-01288-STA-egb |

## ORDER DIRECTING CLERK TO MODIFY DOCKET, DENYING § 2254 PETITION, DENYING CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Petitioner Walter Andrew Ware, a prisoner of the State of Tennessee, has filed a *pro se* petition (ECF No. 1) under 28 U.S.C. § 2254 seeking habeas corpus relief (the "Petition"). For the reasons that follow, the Petition is **DENIED**.

## I.   BACKGROUND

The following background summary is drawn from the state court record (ECF No. 16), and the state appellate court's recitation of the evidence at Petitioner's trial. *See State v. Ware*, No. W2010-01992-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 764 (Tenn. Crim. App. Oct. 7, 2011), *perm. app. denied* 2012 Tenn. LEXIS 130 (Tenn. Feb. 15, 2012).

### A.   Petitioner's Trial and Direct Appeal

In October 2009, a grand jury of Obion County, Tennessee, returned an indictment against Petitioner and Jacqueline Elendt on charges of aggravated child abuse, aggravated child

---
[1] The Clerk is **DIRECTED** to modify the docket to reflect Tony Mays as Respondent.

neglect, and aggravated child endangerment. Technical Record No. CC-09-CR-133, at 4–5, Dec. 21, 2010, ECF No. 16-1. Elendt pleaded guilty to child abuse and child neglect. *Ware*, 2011 Tenn. Crim. App. LEXIS 764, at *2. And she agreed to testify against Petitioner. *Id.*

At trial, Elendt testified that she is the mother of N.W., an infant, and Petitioner is N.W.'s father. N.W. was born in May 2009. *Id.* When N.W. was a month old, the family moved into the home of Dana Northam, a friend. *Id.* In July 2009, Elendt was employed at an Arby's restaurant, and Petitioner was unemployed. *Id.* at *3. On July 28, 2009, Elendt worked from 11:30 am. until 4:30 p.m. while Petitioner stayed home and cared for the infant. *Id.* Elendt testified that "[w]hen she left for work that morning, N.W. appeared fine." *Id.* "When she returned, [Petitioner] 'barely [let her] take care of'" the baby. *Id.* During the night, N.W. awoke several times and Petitioner "got up with her each time." *Id.* The next day, Elendt noticed a bruise on the child's face. When she asked Petitioner about it, Petitioner "told her that 'she was a baby and to leave it alone.'" *Id.* Elendt did not notice anything else wrong with N.W. during the remainder of the day, although "she did not hold [her] during this time and . . . [Petitioner] primarily took care of her." *Id.* at *4.

Elendt further testified that "[a]t 2:00 a.m. . . . the following [day], N.W. awoke with a fever." *Id.* She gave the child Tylenol and fed her, but the infant "threw up" the milk. *Id.* She asked Northam for a thermometer, but Northam told Elendt that she did not have one. Elendt then noticed that N.W. "was 'shaking on one side of her body and her eyes were twitching.'" *Id.* She woke Petitioner up and told him that they needed to take N.W. to the hospital. *Id.* Petitioner stated that he did not want to take the child to the hospital, but he "finally acquiesced" upon Elendt and Northam's urgings. *Id.* at *4–5. As they were getting into the car, Petitioner "said to

Elendt, 'It's gonna be [you] and [me] if there was nothing wrong with her.'" *Id.* at *5 (alteration in original).

On cross-examination, Elendt acknowledged that Northam's boyfriend and her six- or seven-year-old son also lived at her house. *Id.* Elendt agreed that she would receive judicial diversion in exchange for her guilty pleas and her testimony against Petitioner. She stated that she "did not recall Northam ever watching N.W. so that [Petitioner] could" work. *Id.* But Elendt then conceded that she had told the Department of Children's Services "that Northam watched N.W. so that [Petitioner] could" detail cars. *Id.*

Dana Northam testified "that she babysat N.W. a 'few times' for 'a couple of hours' while" Elendt and Petitioner "lived with her," but Northam also stated that "she never babysat for N.W. while [Petitioner] was working because he did not ever go to work while he lived with her." *Id.* at *6. She stated that in the early hours of July 30, 2009, Elendt asked her for a thermometer, which Northam did not have. *Id.* She recalled that Petitioner and Elendt "began arguing because Elendt wanted to take N.W. to the hospital and [Petitioner] did not." *Id.* at *7. When police questioned Northam, she "denied ever shaking N.W. and denied ever seeing anyone else shake N.W." *Id.* On cross-examination, she acknowledged that "she had previously stated that both Elendt and [Petitioner] . . . look[ed] for a thermometer." *Id.* She said she had never observed "either parent do anything she deemed 'inappropriate' with N.W. or endanger N.W. in any way." *Id.*

Union City Police Officer Todd Wright then "testified that he responded to a call from hospital staff about the possible child abuse of N.W." *Id.* While at the hospital, he viewed and took pictures of N.W. and interviewed Elendt and Petitioner. *See id.* at *7–8. Wright showed the jury the photographs of the victim. *Id.* at *8.

3

Dr. Karen Lankin, an expert in the field of pediatric medicine and the Medical Director for the Lebonheur Child Assessment Program at Lebonheur Children's Medical Center in Memphis, testified that "Union City Hospital transferred N.W. to LeBonheur Children's Medical Center, on July 30, 2009." *Id.* That same day, the infant's "treating physician sought Dr. Lankin's consultation." *Id.* at *8–9. Dr. Lankin examined N.W., and observed "bruises on [her] arms, torso, back, right thigh, above her right cheek and right eyelid, and on her right ear." *Id.* at *9. The infant also had seven fractured ribs, fractured tibias, and a fractured right femur. *Id.* A CT suggested a possible skull fracture but was not conclusive "because of the swelling." *Id.* N.W. also had "'extensive retinal hemorrhages' in both her eyes," "'extensive bleeding or hemorrhaging on both hemispheres of [the] brain and a significant area of a hematoma in . . . her brain . . . .'" *Id.* at *10. Dr. Larkin opined that "N.W. had suffered abusive head trauma," which had resulted in the child's seizures. *Id.*

She testified that "N.W.'s injuries were consistent with 'Shaken Baby Syndrome,' and [that] the injuries were life-threatening." *Id.* at *11. She stated "that doctors were unable to definitively determine precisely how old the injuries were but that they were no more than 'a few days old.'" *Id.* at *10. "[A]fter gathering N.W.'s medical history, and the statements from her caregivers, she determined that all N.W.'s injuries occurred during one event within 72 hours of her first CT scan." *Id.* at *11.

On cross-examination, Dr. Larkin acknowledged that "an infant can suffer skull fractures from falling . . . out of someone's arms or off of a changing table" or from the use of forceps at birth. *Id.* She further stated that "N.W.'s pediatric records indicated that Jacqueline Elendt . . . was her primary caretaker." *Id.* at *11–12.

4

The defense called Calvin Walter Ware, Petitioner's father, to the stand. *Id.* at *12. Calvin testified that N.W. "was doing 'pretty good . . . considering,' . . . was crawling and talking," and "seemed like a normal one-year-old child." *Id.*

The jury convicted Petitioner of aggravated child abuse, aggravated child neglect, and aggravated child endangerment. *Id.* The convictions were merged, and Petitioner was sentenced to sixteen years' imprisonment. *Id.*

Petitioner took an unsuccessful direct appeal, *id.* at *30, and the Tennessee Supreme Court denied permission to appeal. *State v. Ware*, 2012 Tenn. LEXIS 130 (Tenn. Feb. 15, 2012).

### B. Post-conviction Proceedings

On December 11, 2012, Petitioner filed a *pro se* petition for state post-conviction relief, alleging ineffective assistance of counsel. Technical Record No. CC-12-CR-154, at 2–4, July 30, 2013, ECF No. 16-14. An attorney was appointed to represent him. *Id.* at 56–57. After holding an evidentiary hearing, the post-conviction court denied relief. *Id.* at 67–70. Petitioner unsuccessfully appealed. *Ware v. State*, No. W2013-01079-CCA-R3-PC, 2014 Tenn. Crim. App. LEXIS 498, at *11 (Tenn. Crim. App. Apr. 28, 2014), *perm. app. denied* 2014 Tenn. LEXIS 656 (Tenn. Sept. 3, 2014).

### C. Federal Habeas Petition

On October 21, 2014, Petitioner filed his Petition, in which he asserts the following claims:

> Claim 1: The evidence was insufficient to support the convictions. Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, at 5, Oct. 21, 2014, ECF No. 1 [hereinafter "Pro Se Pet."].

5

Claim 2: Trial counsel rendered ineffective assistance by failing to call Dr. O.C. Smith as a witness. *Id.* at 7.

## II.  STANDARD OF LAW

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254. Under § 2254, habeas relief is available only if the prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The availability of federal habeas relief is further restricted where the petitioner's claim was "adjudicated on the merits" in the state courts. 28 U.S.C. § 2254(d). In that circumstance, federal habeas relief "shall not be granted" unless:

> the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court; . . . "involved an unreasonable application of" such law; or . . . "was based on an unreasonable determination of the facts" in light of the record before the state court.

*Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citing 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

For purposes of § 2254(d)(2), a state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion . . . ." *Wood*

*v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams*, 529 U.S. at 411). The Sixth Circuit construes § 2254(d)(2) in tandem with § 2254(e)(1) to require a presumption that the state court's factual determination is correct in the absence of clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). A state court's factual findings are therefore "only unreasonable where they are rebutted by clear and convincing evidence and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted).

Before a federal court will review the merits of a claim brought under § 2254, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The exhaustion provision "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . ." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

In light of this purpose, the Supreme Court has interpreted the exhaustion provision as requiring not mere "technical" exhaustion, *Coleman v. Thompson,* 501 U.S. 722, 732 (1991), but "proper[]" exhaustion. *Boerckel*, 526 U.S. at 848 (emphasis omitted). A claim is technically exhausted when state remedies are no longer available to the petitioner. *Coleman*, 501 U.S. at 732 (citing 28 U.S.C. § 2254(b); *Engle v. Isaac*, 456 U.S. 107, 125–26 (1982)). Technical exhaustion therefore encompasses not only situations where the petitioner fully presented his claim to the state courts but also instances where the prisoner did not present his claim to the state courts at all or failed to present it to the highest available court—and the time for doing so has expired. *Boerckel*, 526 U.S. at 845; *Wood v. Ngo*, 548 U.S. 81, 92–93 (2006). If federal habeas courts were generally allowed to review such claims, the exhaustion provision's purpose

7

of giving the state courts the first opportunity to resolve federal constitutional issues would be "utterly defeated." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (quoting *Boerckel*, 526 U.S. at 848). "To avoid this result, and thus protect the integrity of the federal exhaustion rule," a claim must be "properly exhausted," meaning it must be "fairly presented" through "one complete round of the State's established appellate review process." *Boerckel,* 526 U.S. at 845, 848 (internal quotation marks and emphasis omitted).

The exhaustion requirement works in tandem with the procedural default rule, which generally bars federal habeas review of claims that were procedurally defaulted in the state courts. *Id.* at 848. Broadly speaking, procedural default happens in one of two ways. A petitioner procedurally defaults his claim where he fails to properly exhaust available remedies (that is, fails to fairly present the claim through one complete round of the state's appellate review process), and he can no longer exhaust because a state procedural rule or set of rules have closed-off any "remaining state court avenue" for review of the claim on the merits. *Harris v. Booker*, 251 F. App'x 319, 322 (6th Cir. 2007). Procedural default also occurs where the state court "actually . . . relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729 (citing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935); *Klinger v. Missouri*, 80 U.S. 257 (1872)).

Only when the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law" or demonstrates that the court's "failure to consider the claim[] will result in a fundamental miscarriage of justice," will he be entitled to federal court review of the merits of a claim that was procedurally defaulted. *Id.* at 750. The ineffectiveness

8

of post-conviction counsel may be cause to excuse the default of an ineffective-assistance-of-trial-counsel claim. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez v. Ryan*, 566 U.S. 1, 9 (2012)); *see also Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013). A fundamental miscarriage of justice involves "a prisoner['s] assert[ion of] a claim of actual innocence based upon new reliable evidence." *Bechtol v. Prelesnik*, 568 F. App'x 441, 448 (6th Cir. 2014) (citing *House v. Bell*, 547 U.S. 518, 536 (2006)).

### III. DISCUSSION

Respondent filed a Response to the Petition in which he argues that a portion of Claim 1 is procedurally defaulted and the remaining claims are without merit (ECF No. 17). Petitioner disputes these arguments in his Reply (ECF No. 20).

#### A. Claim 1: Insufficiency of the Evidence

In Tennessee, a person who commits the offense of child abuse, neglect, or endangerment, as set forth in Tenn. Code. Ann. § 39-15-401, is guilty of the aggravated form of the offense where the act of abuse, neglect, or endangerment "results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). In Claim 1A, Petitioner asserts that the evidence was insufficient to convict him of aggravated child abuse, aggravated child neglect, and aggravated child endangerment because "[t]here [wa]s no direct evidence against" him, "the primary witness against him" was "a co-defendant," and "[t]here were other suspects in the house who could have committed the offense[s]." Pro Se Pet., at 5. In Claim 1B, he argues that the evidence was insufficient to convict him of aggravated child neglect because "the record is devoid of any proof" that his alleged "failure to seek prompt medical care" caused "any injury

9

after the initial act of abuse." Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus Pursuant to 28 U.S.C. 2254, at 17, Oct. 21, 2014, ECF No. 1-1 [hereinafter "Mem. of Law"]. Petitioner concedes that "the question of whether the Petitioner sought medical treatment is relevant to . . . whether the Petitioner knowingly neglected the child . . ." but asserts that "it is not dispositive of the second element required for conviction, which is whether the neglect resulted in serious bodily injury to the child." *Id.*

Claim 1B is not reviewable in this federal habeas proceeding. On direct appeal, Petitioner argued that the evidence was insufficient to establish that he was the perpetrator. Brief of the Def., at 12–18, Jan. 25, 2011, ECF No. 16-9 [hereinafter "Pet'r's Appeal Brief"]. But in Claim 1B, he argues that, for purposes of aggravated child neglect, the evidence was insufficient to establish a causal link between his alleged failure to seek medical care and a distinct injury to the infant. Mem. of Law, at 17. Because the time for Petitioner to raise that theory of evidence sufficiency in the state courts has passed, the claim is procedurally defaulted. Petitioner has not alleged cause to excuse the default. Claim 1B is therefore **DISMISSED**.

Claim 1A, which is based on the same arguments Petitioner advanced in his direct appeal, was properly exhausted in the state courts and is thus reviewable by the Court under the AEDPA's deferential standards. On direct appeal, Petitioner argued that the evidence was insufficient to support his convictions because there was no direct evidence that he was the perpetrator and the circumstantial evidence did not exclude the four other individuals who had access to the infant—Elendt, Northam, Northam's boyfriend, and Northam's son. Pet'r's Appeal Brief, at 12–18. He also argued that, under state law, Elendt's testimony should have been corroborated since she was an accomplice. *Id.*

The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the federal due process standard for evidentiary sufficiency in criminal cases and therefore governs Petitioner's claim. *See Coleman v. Johnson*, 566 U.S.650, 651 (2012) (per curiam) (explaining the application of *Jackson* to sufficiency-of-the-evidence claims on habeas review under § 2254(d)). In *Jackson*, the Supreme Court announced that "the relevant question" "on review of the sufficiency of the evidence to support a criminal conviction," is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318–19 (emphasis in original). The standard may be met with circumstantial evidence. *See Desert Palace, Inc., v. Costa*, 539 U.S. 90, 100 (2003) (citing *Holland v. United States*, 328 U.S. 121, 140 (1954)) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required.").

When reviewing the evidence in the light most favorable to the prosecution, a court must "give[] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Therefore, in federal habeas proceedings, "*Jackson* claims . . . are subject to two layers of judicial deference": deference to the "responsibility of the jury . . . to decide what conclusions should be drawn from evidence admitted at trial," and deference under the AEDPA's standards to the state reviewing court's evidence-sufficiency determination. *Coleman*, 566 U.S. at 651.

In its decision on direct appeal, the Tennessee Court of Criminal Appeals stated that "[t]o sustain the Defendant's conviction for aggravated child abuse, the State had to prove that the Defendant committed the offense of child abuse or neglect, and the conduct resulted in serious

bodily injury to the child." *Ware*, 2011 Tenn. Crim. App. LEXIS 764, at *19 (citing Tenn. Code Ann. § 39-15-401(a)). It expressly invoked *Jackson*'s standards and reviewed the trial evidence in the light most favorable to the prosecution. *Id.* at *17, *19–23.

The appellate court found that the direct evidence established that the victim sustained abusive head trauma and other serious injuries. *Id.* at *20–21. Applying the federal rule, adopted in Tennessee, that a conviction may be based on circumstantial evidence, *id.* at *17 (quoting *Tennessee v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992)), the court also held that the circumstantial evidence sufficiently supported the prosecution's theory that the defendant was the perpetrator. *Id.* at *21–22. Although no one witnessed the abuse, Elendt and Northam's testimonies showed that Petitioner had access and control over the infant at the relevant time and that Northam "did not babysit N.W. during this time period." *Id.* at *21. The court also found that the women's testimonies established that the defendant was reluctant to take the child to the hospital when she presented with a high fever and a seizure. *Id.* at *21–22. The court concluded that

> a rational jury could have inferred that the Defendant's reluctance to seek medical treatment for N.W. indicated that he had hurt the child and did not want doctors to examine her. In the 72 hours preceding N.W.'s hospitalization, the Defendant and Elendt were N.W.'s caretakers and, by all accounts, the Defendant "had" N.W. even when Elendt was home, and he kept N.W. when Elendt was working. Elendt testified before the jury and denied hurting N.W. Hearing the evidence, the jury determined that the Defendant was the only one who could have injured N.W., and we will not disturb their interpretation of the evidence.

*Id.* at *22–23.

Regarding Petitioner's claim that Elendt's testimony constituted the uncorroborated testimony of an alleged accomplice and was therefore not sufficient to support the verdict, the Court of Criminal Appeals addressed this issue as one of state law. *Id.* at *23–25. The court determined that Elendt's testimony was adequately corroborated. *Id.* at *24–25.

12

Petitioner is not entitled to relief under the AEDPA. First, the appellate court's evidence-sufficiency determination was not "contrary to" clearly established law federal law, 28 U.S.C. § 2254(d)(1), because the court expressly invoked and applied *Jackson*'s standards. *See Williams*, 529 U.S. at 406 (A "state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

Second, the Court of Criminal Appeals' evidence-sufficiency determination was not based on an unreasonable determination of the facts or an unreasonable application of *Jackson*'s standards to those facts. *See* 28 U.S.C. § 2254(d). As noted, *Jackson*'s evidence-sufficiency standard may be met with circumstantial evidence. *See Desert Palace*, 539 U.S. at 100. The circumstantial evidence in Petitioner's trial consisted primarily of facts presented through the testimonies of Elendt and Northam regarding the defendant's access to the infant and his reluctance to seek medical care. The appellate court's conclusion that these facts give rise to the reasonable inference that Petitioner was the perpetrator was not unreasonable. In addition, the court's refusal to disturb the jury's determination that Elendt and Northam were credible is consistent with *Jackson*'s demands. *See Jackson*, 443 U.S. at 318–19 (holding it is the jury's responsibility to make credibility determinations). Petitioner has not identified "clear and convincing evidence" to undermine the jury's factual determinations. 28 U.S.C. § 2254(e)(1).

As for Petitioner's assertion that the Court of Criminal Appeals erred in finding that Elendt's testimony was corroborated, that issue is purely one of state law. Under Tennessee law, an accomplice's testimony must be corroborated, *see Ware*, 2011 Tenn. Crim. App. LEXIS 764, at *23–24, but no such corroboration is required under federal law. *See United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999) (holding it is "well-settled that uncorroborated

testimony of an accomplice may support a conviction in federal court.") (citing *Krulewitch v. United States,* 336 U.S. 440, 454 (1949); *United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995)). Petitioner's state-law argument therefore has no federal "constitutional dimension" and thus is not cognizable on federal habeas review. *Beaird v. Parris*, No. 3:14-cv-01970, 2015 U.S. Dist. LEXIS 84769, at *36 (M.D. Tenn. June 30, 2015) (citing *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985)) (denying relief under § 2254 on petitioner's claim that his accomplice's testimony was uncorroborated since "[t]he rule . . . is a state-law rule and not one of constitutional dimension.").

Because the Tennessee Criminal Court of Appeals's evidence-sufficiency determination was not contrary to clearly established federal law, based on an unreasonable determination of the facts, or the result of an unreasonable application of the law to those facts, Claim 1A is **DENIED**.

### B. Claim 2: Ineffective Assistance of Counsel

Petitioner alleges that his trial counsel rendered ineffective assistance by failing to call Dr. O.C. Smith as an expert witness to rebut Dr. Larkin's testimony. Pro Se Pet., at 7. The claim was raised and litigated in both the post-conviction hearing and on appeal. *See Ware*, 2014 Tenn. Crim. App. LEXIS 498, at *3–7. Because Petitioner properly exhausted the claim in the state courts, it is reviewable by this Court under the AEDPA's deferential standards.

A claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on such a claim, a movant must demonstrate two elements: (1) "that counsel's performance was deficient"; and (2) "that the deficient

performance prejudiced the defense." *Id.* at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) (internal quotation marks omitted).

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687, 693).

The deference to be accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when a federal court reviews an ineffective assistance claim:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions

15

were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105 (internal quotation marks and citations omitted).

On review of the record adduced at Petitioner's post-conviction hearing, the Tennessee Court of Criminal Appeals affirmed the lower court's determination that trial counsel had not rendered ineffective assistance by failing to call Dr. Smith to the stand. *Ware*, 2014 Tenn. Crim. App. LEXIS 498, at *11. Expressly invoking *Strickland*'s standards, the appellate court held that Petitioner had not established that he was prejudiced by his trial counsel's conduct. *Id.* at *8–11. The lower court noted that the doctor did not testify at the post-conviction hearing and did not submit an affidavit stating what his trial testimony would have been. *Id.* at *10. In the absence of such evidence, the court concluded that there was no way to know if Petitioner was prejudiced by his trial attorney's decision not to call the doctor to testify. *Id.* at *10–11.

Petitioner has not shown that he is entitled to relief under the AEDPA on Claim 2. First, the Court of Criminal Appeals's ineffective-assistance determination is not "contrary to" clearly established Supreme Court law, 28 U.S.C. § 2254(d)(1), because the appellate court expressly invoked and applied *Strickland*'s standards to the facts before it. *See Williams*, 529 U.S. at 406.

Second, the appellate court's holding is not based on an unreasonable determination of the facts or an unreasonable application of *Strickland*'s standards to those facts. *See* 28 U.S.C. § 2254(d). Petitioner points to no clear and convincing evidence to undermine the appellate court's determination that the record was devoid of evidence of prejudice. The Criminal Court of Appeals was therefore faced with a record which did not evince a "reasonable probability," *Strickland*, 466 U.S. at 694, that the outcome of Petitioner's trial would have been different had counsel called Dr. Smith as a witness.

16

Relying on *Martinez*, 566 U.S. at 9, Petitioner argues that he is entitled to relief on Claim 2 because his post-conviction counsel was ineffective by failing to call Dr. Smith to testify as to what his trial testimony would have been. Pro Se Pet., at 7; Pet'r's Traverse to Resp. Mike Parris's Answer to Pet. for Federal Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, at 10–11, Apr. 17, 2015, ECF No. 20. The argument is rejected.

As noted, *Martinez* recognizes that the ineffective assistance of post-conviction counsel may be cause to excuse a procedural default. 566 U.S. at 9. Petitioner, here, did not procedurally default Claim 2, since he presented the claim at his initial post-conviction proceeding and on appeal. He does not dispute that fact, but argues, essentially, that *Martinez*'s ruling should be extended to a default *of proof*. This Court has rejected that argument in other cases, and does so again here. *See Vizcaino-Ramos v. Lindamood*, No. 1:14-cv-01230-STA-egb, 2017 U.S. Dist. LEXIS 183938, at *13–14 (W.D. Tenn. Nov. 7, 2017) (citing *Henderson v. Carpenter*, 21 F. Supp. 3d 927, 932–33 (W.D. Tenn. 2014); *Williams v. Mitchell*, No. 1:09-cv-2246, 2012 U.S. Dist. LEXIS 140721, at *16–18 (N.D. Ohio Sept. 28, 2012)).[2]

Because the Tennessee Criminal Court of Appeals's ineffective-assistance determination is not contrary to clearly established Supreme Court law, based on an unreasonable determination of the facts, or the result of an unreasonable application of clearly established law to the facts, Claim 2 is **DENIED**.

---

[2] To the extent Petitioner argues that he has a stand-alone claim for the ineffective assistance of post-conviction counsel, the argument is without merit. *See* 28 U.S.C. § 2254(i); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

## IV. ISSUES OF APPEAL

A § 2254 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2)–(3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 252–53 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition. Because any appeal by Petitioner does not deserve attention, the Court **DENIES** a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a). Rule 24(a) also provides, however, that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *Id.*

In this case, for the same reasons it denies a COA, the Court **CERTIFIES**, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is therefore **DENIED**.

## V.  CONCLUSION

The Court having found that Petitioner is not entitled to relief on his claims, the Petition is hereby **DENIED**.  The Clerk is **DIRECTED** to enter Judgment for Respondent.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: March 7, 2018.